# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| [1]OPERATING ENGINEERS CONSTRUCTION INDUSTRY AND MISCELLANEOUS PENSION FUND, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>[1]AUBREY K. McCLENDON,<br>[2]DOMENIC J. DELL'OSSO, JR.,<br>[3]MICHAEL A. JOHNSON,<br>[4]RICHARD K. DAVIDSON,<br>[5]KATHLEEN EISBRENNER,<br>[6]V. BURNS HARGIS,<br>[7]FRANK KEATING,<br>[8]CHARLES T. MAXWELL,<br>[9]MERRILL A. MILLER, JR.,<br>[10]DON NICKLES<br>[11]MARCUS ROWLAND,<br>[12]FREDRICK B. WHITTEMORE,<br>[13]LOUIS A. SIMPSON, and<br>[14]CHESAPEAKE ENERGY CORPORATION,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. CIV-12-640-L<br><br>Class Action<br><br>Complaint for<br>Violation of Federal<br>Securities Laws<br><br>Demand for Jury Trial |

## CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**Page**

I.      SUMMARY OF THE ACTION ............................................................................. 1

II.     JURISDICTION AND VENUE ............................................................................. 5

III.    THE PARTIES .................................................................................................. 6

        A.      Lead Plaintiff ...................................................................................... 6

        B.      Defendants ......................................................................................... 6

IV.     THE FRAUDULENT SCHEME ........................................................................ 12

        A.      McClendon Has Long Dominated the Company and Its Board .................... 12

        B.      Billions of Dollars Of Company Assets Are Transferred To McClendon
                Under The Founders Well Participation Program ..................................... 13

                1.      The FWPP Allows McClendon to Increase His Stake in Company
                        Wells Without Incurring Any of the Up-Front Development Costs
                        Which Are Borne by Chesapeake ................................................. 13

                2.      The Company Falsely Represented That The Interests of McClendon
                        and The Company Are Aligned ................................................... 15

                3.      McClendon's Huge Borrowings on His Well Interests Are
                        Concealed ............................................................................. 16

        C.      Chesapeake's Banks And Business Partners Are Selected Based On Their
                Provision Of Personal Financing And Services To McClendon .................... 17

                1.      McClendon Secretly Used Company Banks For His Personal Loans
                        And Arranged For Those Banks to Participate in Lucrative Deals
                        with the Company ................................................................... 17

                2.      McClendon Sold Rights to His Wells to Banks That He Selected to
                        Participate in Various Transactions With the Company ..................... 20

        D.      Chesapeake Enters Numerous VPPs Which Saddle The Company With
                $1.4 Billion in Undisclosed Liabilities ................................................. 22

  E.  McClendon's Secret Heritage Management Company Hedge Fund .............. 24

V. THE TRUTH IS REVEALED THROUGH A SERIES OF CORRECTIVE
 DISCLOSURES ........................................................................................................ 26

VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND/OR
 MATERIAL OMISSIONS DURING THE CLASS PERIOD .................................. 30

  A.  Chesapeake's Misleading Statements Regarding the FWPP .......... 30

  B.  False and Misleading Statements Regarding Transactions With Financial
    Institutions ....................................................................................... 34

  C.  False and Misleading Statements  Regarding the Hedging Program .............. 40

  D.  False and Misleading Statements Regarding the Company's Business
    Strategy ............................................................................................. 43

  E.  False and Misleading Statements  Regarding Chesapeake's Indebtedness .... 47

VII. CHESAPEAKE'S FINANCIAL STATEMENTS FAIL TO COMPLY WITH
 SEC REGULATIONS .............................................................................................. 50

VIII. SCIENTER ............................................................................................................... 51

  1.  McClendon ........................................................................................ 51

  2.  Board and Senior Executives ............................................................ 52

IX. ALLEGATIONS PERTAINING TO CONTROL PERSON LIABILITY ............... 57

X. FRAUD ON THE MARKET ................................................................................... 59

XI. NO SAFE HARBOR ............................................................................................... 60

XII. LOSS CAUSATION ................................................................................................ 60

XIII. CLASS ACTION ALLEGATIONS ........................................................................ 62

COUNT ONE  ...................................................................................................................... 65

COUNT TWO ...................................................................................................................... 67

PRAYER FOR RELIEF ...................................................................................................... 69

JURY DEMAND................................................................................................................. 70

Plaintiff Operating Engineers Construction Industry and Miscellaneous Pension Fund ("IUOE" or "Plaintiff"), individually and on behalf of itself and all other purchasers of Chesapeake Energy Corporation ("Chesapeake" or the "Company") securities between and including April 30, 2009 and May 10, 2012 (the "Class Period"), alleges the following based upon personal knowledge as to itself and its own acts, and information and belief as to all other matters, based upon, among things, an investigation conducted by and through Plaintiff's attorneys, which included a review and analysis of filings made by Chesapeake with the Securities and Exchange Commission ("SEC"), press releases and other public statements by Chesapeake and the other Defendants, news articles, securities analysts' reports and other publications concerning Chesapeake, and other available information about the Company.   Plaintiff believes further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    SUMMARY OF THE ACTION

1.    Throughout the Class Period, Chesapeake's CEO Aubrey McClendon ("McClendon") leveraged his position at the Company to obtain over a billion dollars of Company assets, and directed the Company's business strategy and selected Chesapeake's business partners in order to increase the amount of Company assets transferred to him,   at Chesapeake's (and its shareholders') expense.   Defendants compounded this fraud by failing to stop and concealing McClendon's improper activities and by falsely representing the potential risks to the Company, the costs and

expenses Chesapeake would incur as a result of the Company's business transactions, and the Company's overall debt, which was, and remains at stratospheric levels.

2.     The chief architect of this fraud was McClendon, who dominated the Company and converted over a billion dollars of its assets to himself, without challenge from the pliant Board of Directors ("Board") or senior executives of the Company.

3.     To accomplish this corporate piracy, McClendon installed an employment perk benefitting him but no other Chesapeake executives.   Under the Company's Founders Well Participation Program ("FWPP"), McClendon had the option (which he naturally exercised every year) to obtain, for free, a 2.5% interest in all the wells drilled by or on behalf of Chesapeake during the year.

4.     While the Company told investors that this program aligned the interests of McClendon and the Company, in fact, it did not.  Under the FWPP, McClendon was able to participate in all the wells that the Company decided to drill based on testing that demonstrated that the wells would produce oil and gas, while avoiding all the expenses of acquisition, exploration, and testing incurred by Chesapeake on land that was not drilled. Thus, under the FWPP, by participating only in the wells deemed to have sufficient reserves, McClendon is guaranteed to get better overall opportunities and returns than the Company or its shareholders.   Similarly, McClendon suffers no downside from the Company's aggressive acquisition and exploration activities, as the costs related to land not drilled are borne by Chesapeake but not McClendon under the FWPP.

5.     To increase the amount of well assets transferred to McClendon under the FWPP, McClendon significantly expanded the Company's land acquisition and

exploration program.   Under McClendon's stewardship, Chesapeake has become the largest natural gas leaseholder in the United States, owning the drilling rights to about 15 million acres, and is second only to Exxon in the production of natural gas.

6.     McClendon's greed came with some costs.   Once McClendon assumed ownership of his 2.5% stake in the Company's new wells, he became responsible for his pro-rata share of the expenses associated with drilling and extracting the oil and gas from those wells.   In order to pay those expenses, McClendon borrowed against his well interests – a huge amount that recently ballooned to $1.55 billion.   And in order to obtain that financing, McClendon offered sweetheart deals to the banks and private equity groups providing him the funds – McClendon made arrangements for those lenders to acquire Company assets and participate in the Company's business by investing in the Company's lucrative drilling operations.

7.     Concealed from investors were the massive amount of well interests accumulated by McClendon, the size of his borrowings on those well interests, the fact that the Company's massive land acquisition and exploration program was designed to serve McClendon's interests but not Chesapeake's, and the fact that Chesapeake's business partners were chosen to advance McClendon's personal interests.   Throughout the Class Period, the Company described the key elements of its business strategy, but never disclosed that its aggressive expansion was driven by McClendon's desire to increase the amount of wells transferred to him, rather than to serve the best interests of the Company.

8.     The over-expansion of the Company's land acquisition and exploration program had profound adverse consequences for the Company.  In order to finance this expansion, Chesapeake had to mortgage its future.  It did so through volumetric production payment ("VPP") transactions in which the Company collected funds up front from banks and other investors in return for agreeing to deliver to them the oil and gas, or the related revenues, from certain wells for a certain period of time.

9.     The Company's obligations under these VPPs grew to $1.4 billion.  However, the Company's liabilities from these off-balance deals were concealed from investors.  Chesapeake's public disclosures of its overall indebtedness were materially false and incomplete, as those disclosures did not include the Company's huge liability associated with its VPPs.

10.     The fraud was perpetrated with full knowledge of the Company's Board and senior executives.  The Board approved revisions of McClendon's employment agreement pursuant to which the well interests were transferred to McClendon under the FWPP, and the Company's Proxy Statements disclose amounts representing McClendon's use of Company staff for his "personal financing transactions."  Moreover, the Company's General Counsel, Henry Hood, recently admitted that the Board is aware that McClendon pledged his well interests to obtain personal financing.

11.     Additionally, the Company's senior executives could not possibly be unaware of the extraction and delivery of huge amounts of the Company's oil and gas to third parties pursuant to VPPs entered into by McClendon and Chesapeake.  Indeed, the extraction and delivery was not accomplished under the dark of night, and the VPP deals

were no secret, as the Company mentioned VPP transactions in its public filings, but failed to disclose the Company's huge liability from those deals.

12.     Beginning April 18, 2012, Defendants' fraud was revealed to the market in a series of piecemeal corrective disclosures.  On that day, Reuters shocked the market with news that McClendon had acquired a huge stake in the Company's numerous oil and gas wells and had borrowed as much as $1.1 billion on those assets.  Reuters later disclosed that McClendon's borrowings secured by his well interests had ballooned to $1.55 billion.

13.     Subsequent news reports disclosed that McClendon had been running his own hedging business out of his Chesapeake offices and that the Company had $1.4 billion in previously undisclosed off-balance sheet liabilities related to VPP deals, putting Chesapeake in danger of violating its loan covenants.

14.     As a result of these and other corrective disclosures, Chesapeake's stock, which closed on April 17, 2012 at $19.12, dropped with each new disclosure of an aspect of the fraud, finally closing on May 11, 2012 at $14.81.  Consequently, Plaintiff and other Chesapeake investors have suffered millions of dollars in damages caused by Defendants' fraud.

## II.     JURISDICTION AND VENUE

15.     This claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") (17 C.F.R. § 240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

17.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Chesapeake maintains a principal place of business in this District and many of the acts and practices complained of occurred in substantial part in this District.

18.     In connection with the acts alleged in this complain, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     THE PARTIES

### A.     LEAD PLAINTIFF

19.     Plaintiff IUOE is a retirement fund administered for the benefit of operating engineers and their dependents and beneficiaries in Western Pennsylvania and Eastern Ohio.  Plaintiff purchased Chesapeake common stock as described in the certification attached hereto as Exhibit 1 and was damaged when the public became aware of Chesapeake's false and misleading statements and material omissions and, as a result, the price of Chesapeake's stock dropped.

### B.     DEFENDANTS

20.     Defendant Chesapeake is an Oklahoma corporation with its principal place of business at 6100 North Western Avenue, Oklahoma City, Oklahoma.  The Company was co-founded by Defendant McClendon in 1989 and had its initial public offering in

1993.  Currently, Chesapeake is the second-largest producer of natural gas, a top 15 producer of oil and natural gas liquids, and the most active driller of new wells in the U.S.  It trades on the NYSE under the symbol "CHK."

21.     Defendant Aubrey K. McClendon is Chesapeake's CEO and has served as both CEO and Chairman of the Board from 1989 until early May 2012, when the Board stripped McClendon of his Chairman position.  McClendon signed all of the Company's relevant 10-Q and 10-K filings during the Class Period.

22.     Defendant Domenic J. Dell'Osso, Jr. ("Dell'Osso") currently serves as Executive Vice President of Finance and Chief Financial Officer of Chesapeake. Dell'Osso also serves as Chief Financial Officer and Executive Vice President of Finance of Chesapeake Midstream Development, L.P., a Chesapeake subsidiary.   During the Class Period, Defendant Dell'Osso signed the following Chesapeake SEC filings: 10-K filed March 1, 2011 (the "March 2011 10-K"); 10-K filed February 29, 2012 (the "February 2012 10-K"); 10-Q filed November 9, 2010 (the "November 2010 10-Q"); 10-Q filed May 10, 2011 (the "May 2011 10-Q"); 10-Q filed August 9, 2011 (the "August 2011 10-Q"); 10-Q filed November 9, 2011 (the November 2011 10-Q"); and 10-Q filed May 11, 2012 (the "May 2012 10-Q").

23.     Defendant Michael A. Johnson ("Johnson") has served as Senior Vice President of Accounting, Controller, and Chief Accounting Officer of the Company since 2000.  During the Class Period, Johnson signed the following Chesapeake SEC filings: the 10-K filed March 1, 2010 (the "March 2010 10-K"); the March 2011 10-K; and the February 2012 10-K.

24.     Defendant Richard K. Davidson ("Davidson") has been a member of Chesapeake's Board of Directors since March 2006 and is, and was during the Class Period, a member of the Company's Audit Committee.   During the Class Period, Defendant Davidson signed the following Chesapeake SEC filings:  the March 2010 10-K; the March 2011 10-K and the February 2012 10-K.

25.     Defendant Kathleen Eisbrenner ("Eisbrenner") has been a member of Chesapeake's Board of Directors and its Company's Compensation Committee since December 2010.  During the Class Period, Eisbrenner signed the following Chesapeake SEC filings:  the March 2011 10K and the February 2012 10K.

26.     Defendant V. Burns Hargis ("Hargis") has been a member of Chesapeake's Board of Directors since September 2008 and is, and was during the Class Period, a member of the Company's Audit Committee.  Hargis has been President of Oklahoma State University since March 2008.  From 2008 to the present, Defendant Hargis, in his capacity as President of Oklahoma State University, has received over $10 million from Chesapeake for his university.  During the Class Period, Hargis signed the following Chesapeake SEC filings:  the March 2010 10-K; the March 2011 10-K and the February 2012 10-K.

27.     Defendant Frank Keating ("Keating") has been a member of Chesapeake's Board of Directors since June 2003 and is, and was during the Class Period, the Chair of the Company's Compensation Committee.  During the Class Period, Defendant Keating signed the following Chesapeake SEC filings:  the March 2010 10-K; the March 2011 10-K and the February 2012 10-K.

28.     Defendant Charles T. Maxwell ("Maxwell") has been a member of Chesapeake's Board of Directors since 2002 and is, and was during the Class Period, a member of the Company's Compensation Committee.  During the Class Period, Maxwell signed the following Chesapeake SEC filings:  the March 2010 10-K; the March 2011 10-K and the February 2012 10-K.

29.     Defendant Merrill A. Miller, Jr. ("Miller") has been a member of Chesapeake's Board of Directors since January 2007, is, and was during the Class Period, a member of the Company's Audit Committee, and has been designated as lead independent director by the Company since March 2010, according to Chesapeake's website.  Miller is also the lead director of National Oilwell Varco, Inc., a drilling company that has received $343 million from Chesapeake since 2009.  During the Class Period, Defendant Miller signed the following Chesapeake SEC filings:  the March 2010 10-K; the March 2011 10-K and the February 2012 10-K.

30.     Defendant Don Nickles ("Nickles") has been a member of Chesapeake's Board of Directors since January 2005 and is, and was during the Class Period, a member of the Company's Nominating and Corporate Governance Committee.  During the Class Period, Nickles signed the following Chesapeake SEC filings:  the March 2010 10-K; the March 2011 10-K and the February 2012  10-K.

31.     Defendant Marcus Rowland ("Rowland") served as Chesapeake's Chief Financial Officer and Executive Vice President of Finance until October 29, 2010. During the Class Period, Rowland was also a member of the Company's Compensation Committee.  During the Class Period, Rowland signed the following Chesapeake SEC

filings:  the March 2010 10-K; the 10-Q filed May 11, 2009 (the "May 2009 10-Q"); the

10-Q filed August 10, 2009 (the "August 2009 10-Q"); the 10-Q filed November 9, 2009

(the "November 2009 10-Q"); the 10-Q filed May 10, 2010 (the "May 2010 10-Q"); the

10-Q filed July 30, 2010 (the "July 2010 10-Q"); the 10-Q filed August 9, 2010 (the

"August 2010 10-Q") and the November 2010 10-Q.

32.     Defendant Fredrick B. Whittemore ("Whittemore") was a member of

Chesapeake's Board of Directors and its Compensation Committee from 1993 to 2011.

During the Class Period, Defendant Whittemore signed the following Chesapeake SEC

filings:  the March 2010 10-K and the March 2011 10-K.

33.     Defendant Louis A. Simpson ("Simpson") has been a member of

Chesapeake's Board of Directors since June 2011 and is, and was during the Class

Period, a member of the Company's Nominating and Corporate Governance Committee.

During the Class Period, Simpson signed Chesapeake's February 2012 10-K.

34.     Defendants McClendon, Dell'Osso, Johnson, Davidson, Eisenbrenner,

Hargis, Keating, Maxwell, Miller, Nickles, Rowland, Whittemore and Simpson are herein

referred to as the "Individual Defendants."  Defendants McClendon, Dell'Osso, Rowland,

and Johnson are referred to herein as the Senior Executive Defendants.

35.     During the Class Period, the Senior Executive Defendants by virtue of their

senior executive positions at Chesapeake, were in privy to confidential information

concerning Chesapeake, its operation, finances, financial condition and present and future

business prospects.  The Senior Executive Defendants also had access to materially

adverse non-public information concerning McClendon's transactions with the Company,

as discussed in detail below.  Because of their possession of such information, the Senior Executive Defendants knew or recklessly disregarded that the adverse facts specified herein were misrepresented and/or had not been disclosed to, and were being concealed, from the investing public.

36.     Each of the Individual Defendants is liable as direct participants in the wrongs complained of herein.  Each of the Individual Defendants made a false statement or failed to disclose material information that was needed to render the Company's other public statements not materially misleading.   In addition, the Senior Executive Defendants were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Senior Executive Defendants were able to and did, directly or indirectly, control the conduct of Chesapeake's business.

37.     As members of the Chesapeake Board and/or senior executives and controlling persons of a publicly traded company whose common stock was, and is registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Chesapeake's financial condition and performance, operations, management, and relationship with McClendon.   The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

IV.     **THE FRAUDULENT SCHEME**

38.     The story of Chesapeake's huge growth as one of the largest developers of oil and gas wells in the United States is fraught with greed and deception.   While investors naturally believed the Company's representations about its business activities and assumed that the Company's huge expansion in exploration and drilling was in the Company's best interest, recent disclosures have revealed that the primary reason for the expansion was to increase the amount of Company assets that would be converted to McClendon personally (and for free), even though, as a result, the Company would be saddled with a crippling amount of debt.   Investors further learned that McClendon appears to have chosen partners for Chesapeake's exploration and drilling program based on their willingness to do business with him, rather than whether a particular partner was best for the Company, and that McClendon had only upside in connection with well drilling, leaving him incentivized to overload the Company with debt.

A.     **MCCLENDON HAS LONG DOMINATED THE COMPANY AND ITS BOARD**

39.     Since McClendon founded Chesapeake in 1989, he has completely dominated the Company and its Board.  As the Wall Street Journal noted in an April 27, 2012 article, McClendon "has been involved in every aspect of the company, from its complex financial dealings to the music it offers at its campus gym."

40.     McClendon's domination was evident in 2008, when the Company made him the highest-paid CEO of any S&P 500 company, paying him total compensation of $112 million, plus $12.1 million to purchase the antique maps in his personal art collection.   This huge package was designed to bail McClendon out of the debt he

accumulated by margining his Chesapeake stockholdings to obtain personal loans over $600 million. When Chesapeake's stock price tanked in 2008 due to the Company's poor earnings and growing debt, McClendon was forced to sell over 31 million Chesapeake shares to cover $569 million in margin calls from his brokers (the "2008 Margin Call"). The Board further accommodated McClendon by suspending the requirement that McClendon own shares in the Company worth five times his annual salary.

41.     Also that year, the Board lavished McClendon with other perks, including $600,000 for the private use of corporate jets, nearly $600,000 for accounting services, and $131,000 for personal "engineering support." McClendon also arranged for Chesapeake to pay $4.6 million to sponsor the NBA's Oklahoma City Thunder, of which McClendon owns one-fifth.

### B.     BILLIONS OF DOLLARS OF COMPANY ASSETS ARE TRANSFERRED TO MCCLENDON UNDER THE FOUNDERS WELL PARTICIPATION PROGRAM

#### 1.     The FWPP Allows McClendon to Increase His Stake in Company Wells Without Incurring Any of the Up-Front Development Costs Which Are Borne by Chesapeake

42.     While McClendon currently owns about 1.35 million shares of Chesapeake stock (presently with approximately $22 million), this interest is dwarfed by his share in Chesapeake's oil and gas wells. Those Company assets were transferred to McClendon, for free, pursuant to the FWPP. During the Class Period, this perk extended only to McClendon and facilitated the transfer of over a billion dollars of Company assets to him.

43.     Under this program, McClendon may elect to obtain up to a 2.5% interest in all the wells drilled by or on behalf of Chesapeake during a calendar year. Since 1989,

he has made the full election every year.  As a part owner of the wells, McClendon is entitled to his proportionate share of the oil and gas and the revenues generated from sales of those commodities, but must pay a proportionate share of the related drilling, extraction and delivery costs.  After McClendon pays his pro-rated share of the capital costs and expenses that go into these wells, the 2.5% of the oil and gas coming out of the wells, and the 2.5% of the reserves down in the ground, are his, free and clear.

44.     The FWPP allows McClendon to participate in lucrative Company wells without incurring the up front exploration costs.  Before the Company actually drills for oil or gas, it must first identify potential oil and gas reservoirs through the exploration process.  Exploration of new wells includes the costs of drilling an "exploratory well," conducting and developing seismic analysis tests to uncover potential reservoirs, and the salaries and administrative costs associated with the geologists conducting the survey tests.

45.     As part of this exploration and drilling process, Chesapeake pays billions of dollars to acquire land and drilling rights and determine whether there are sufficient oil or gas reserves to justify drilling.  For example, as McClendon explained in the Company's July 29, 2011 earnings call with analysts, the Company spent "between $1.5 and $2 billion acquiring leasehold in Utica."  He said that "If we were a smaller company, we wouldn't have been able to take on that risk."  He further explained that the Company's "size and scale enables us to discover things that we wouldn't otherwise be able to do."

46.     In many cases, the Company's analysis shows that the land is not worth drilling.  For example, as explained in a May 1, 2012 Forbes article, the land Chesapeake

acquired in Michigan "turned out to be virtually worthless for oil and gas" and "other tracts, like in the Haynesville shale … are not economic to drill now or at any time in the foreseeable future."  In these cases, all of the Company's accumulated exploration costs are lost.

### 2. The Company Falsely Represented That The Interests of McClendon and The Company Are Aligned

47. Chesapeake's shareholders necessarily care about the Company's sunk acreage and exploration costs because much of it represents capital going to waste. However, under the FWPP, McClendon is not similarly incentivized to care at all.  On the contrary, it is in his direct financial interest for Chesapeake to grab as much land as possible in order to secure those "sweet spots" where the Company will drill and in which McClendon will personally "invest" under the FWPP.  Where analysis shows that the land is flush with oil or gas deposits, the Company decides to drill, and does so in the choicest parts of a field to ensure the best return on its investment.  The land that holds the "sweet spots" where the Company decides to drill is worth significantly more than less attractive surrounding acreage where the Company does not drill.

48. Under the FWPP, McClendon only participates in the good acreage where the Company drills – he does not incur any of the up-front costs of exploration and related analysis on land that is not drilled.  Thus, he is guaranteed to get better overall opportunities and better returns than Chesapeake's shareholders.

49. However, Chesapeake did not disclose this divergence between the Company's and McClendon's interests.   To the contrary, Chesapeake repeatedly

emphasized that the purpose of the FWPP was to align the interests of McClendon and the Company, even though the FWPP in fact did the opposite. The conflicting interests between McClendon and the Company were concealed from investors.

### 3.    McClendon's Huge Borrowings on His Well Interests Are Concealed

50.    Also concealed from Plaintiff and other class members was the size of the stake that McClendon had in the Company's wells and the fact that he had leveraged all of his FWPP interests in order to pay his proportionate share of the associated drilling, extraction and delivery costs.

51.    On April 18, Reuters disclosed that, through the FWPP, McClendon had borrowed as much as $1.1 billion by pledging his personal interests in those oil and gas assets, including many wells that have not even been drilled, as collateral. On May 9, 2012, Reuters reported that McClendon's borrowings secured by his well interests had ballooned to $1.55 billion (since 2009) as a result of an additional $450 million loan secured in the past few weeks.

52.    Investors were shocked at the size of McClendon's stake in the Company's assets, the size of his borrowings, and the fact that his loans were from an entity that was also providing financing to the Company. The Company had previously concealed McClendon's loans and the risk that, to get that financing, McClendon compromised the Company's bests interests in order to secure favorable terms on his personal loans.

**C.** **CHESAPEAKE'S BANKS AND BUSINESS PARTNERS ARE SELECTED BASED ON THEIR PROVISION OF PERSONAL FINANCING AND SERVICES TO MCCLENDON**

**1.** **McClendon Secretly Used Company Banks For His Personal Loans And Arranged For Those Banks to Participate in Lucrative Deals with the Company**

53.     Even though stakes in numerous Company wells were transferred to McClendon for free, and without the related exploration costs on lands that were not drilled, McClendon was still on the hook for his pro-rata share of the costs of tapping the reserves in those wells.  In order to pay those expenses, McClendon had to borrow money in a difficult credit environment.  In order to secure the needed financing, McClendon turned to banks and private equity groups that were also seeking to do business with the Company.  Thus was born the *quid pro quo*:  the banks and private equity groups would lend money and provide services to McClendon, and in return, those entities got the Chesapeake business and investment opportunities they coveted.

54.     The biggest lender to McClendon is the private equity group EIG Global Energy Holdings ("EIG").  According to recent reports, EIG recently lent McClendon $450 million.  Counting that loan, McClendon's total financing from EIG since 2010 is $1.33 billion.

55.     Recent news reports have revealed that, in two earlier loan deals, EIG provided financing to McClendon through entities he controlled.  In the fall of 2008, McClendon did not have the liquidity needed to participate in the FWPP program, at which point EIG offered to assist him.  EIG formed a special purpose vehicle called

17

Larchmont Resources LLC ("Larchmont").  Through Larchmont, EIG acquired the rights

to all of McClendon's well stakes for 2009 and 2010.

56.     EIG then set up a new special purpose vehicle – Jamestown Resources LLC

("Jamestown") – to control McClendon's well shares in 2011, with rights to 2012.

57.     McClendon used these special purpose vehicles to borrow hundreds of

millions of dollars from EIG.  Through Larchmont, McClendon received $375 million,

and through Jamestown, he received another $500 million.

58.     The latest McClendon loan (for $450 million) was arranged in late March

through a McClendon-controlled company called Pelican Energy LLC ("Pelican") which

was formed on March 6, 2012.  The $450 million financing from EIG is collateralized by

all of Pelican's assets and include McClendon's interests in wells Chesapeake might drill

in 2013 and the first half of 2014.

59.     Through EIG, McClendon was able to raise cash for himself at a difficult

time in the credit markets and a difficult time for the Company.  Additionally, at that

time, Chesapeake was forced to shed some choice assets, including valuable Texas shale

acreage slated for a third-quarter sale, to cope with decade-low gas prices – Chesapeake

disclosed in May 2010 that it was selling its valuable Marcellus shale properties to raise

$2 billion in cash in order to pay down part of its over $12 billion in debt.

60.     The combined size of all of McClendon's loans – $1.55 billion – equals

over a tenth of Chesapeake's total long-term debt, but these borrowings had been

concealed from investors.  Additionally, Reuters recently disclosed that McClendon used

the same deal team – Chesapeake executives, bankers and lawyers – for both his personal

transactions and the Company's (including the Company's financings with EIG), but this information was concealed from investors.

61.     EIG's dealings with McClendon have been extremely profitable for that firm.  According to an April 19, 2012 Reuters article, in exchange for financing from EIG, McClendon guaranteed EIG 100% of the revenues from McClendon's well stakes until EIG achieved a 13% return on investment.  After the principal is paid off, EIG would receive a 42% share of production from those wells, in perpetuity.

62.     In addition to lending McClendon hundreds of millions of dollars, EIG was able to leverage its position with McClendon to become a major investor in Chesapeake. EIG invested in units of Chesapeake through purchases of preferred shares in Chesapeake entities that control oil and gas rich land and pay dividends and royalty interest from wells located there.   In one of those transactions, EIG invested $100 million in Chesapeake subsidiary CHK Cleveland Tonkawa, which deal raised $1.25 billion for Chesapeake.  As the Wall Street Journal reported on April 27, 2012, in the last six months alone, EIG "has participated in groups that have purchased about $2.5 billion in Chesapeake assets."

63.     McClendon has also personally borrowed money from Bank of America Corp. and Goldman Sachs Group Inc.  The Wall Street Journal disclosed that McClendon is listed on certain documents as a debtor to Bank of America and Goldman Sachs.

64.     In return for this financing, Bank of America and Goldman Sachs each received the choice assignments as underwriters of the initial public offering of Chesapeake's oilfield services unit called Chesapeake Oilfield Services Inc.

("Chesapeake Oilfield"), announced by Chesapeake on April 16, 2012.  In addition to receiving underwriter fees, Bank of America (through Merrill Lynch) and Goldman Sachs served as lenders under Chesapeake Oilfield's revolving credit facility and under Chesapeake's revolving credit facility and will thereby receive a portion of the net proceeds from the offering through the repayment of borrowings under the credit facilities.  McClendon's personal dealings with EIG, Bank of America and Goldman Sachs and the conflict issues they raised were concealed from investors.

> **2.**    **McClendon Sold Rights to His Wells to Banks That He Selected to Participate in Various Transactions With the Company**

65.    In addition to borrowing money in order to pay his pro-rata share of the costs associated with the wells transferred to him, McClendon sold the future rights to the oil and gas reserves to banks to raise funds.  Those banks were then selected to participate in business dealings with Chesapeake.

66.    On April 18, 2012, Forbes published an article revealing new details about McClendon's use of his Chesapeake holdings to secure personal financings.  According to that article, McClendon has entered into private transactions called volumetric production payments ("VPP").  Under two of these agreements alone, McClendon has collected over $130 million up front from banks and investors in return for agreeing to deliver to them set amounts of gas from his interests in Company wells for a certain period of time.  In effect, McClendon has sold to third parties a temporary overriding interest in Company assets that were assigned only to him.

67.     It was later revealed (on May 3 by Bloomberg) that McClendon had agreed to sell $88 million of his personal oil and gas interests under the VPPs to investment vehicles created by Wachovia Corp., just three weeks after Chesapeake used that bank in a similar $600 million deal.  Wachovia had previously (in 2008) arranged two VPP transactions for McClendon and one for Chesapeake.  McClendon's partnership, called Chesapeake Investments, LP, sold for $44 million the rights to future gas production from McClendon's well interests to an entity called TW Investors LLC ("TW"), which shared an address with Wachovia's headquarters in Charlotte, North Carolina.  Wachovia also set up commodity swap transactions to facilitate the deal.  Later, Wachovia set up a $600 million VPP transaction with Chesapeake, known as the Sooner Gas Trust.  Sooner's officers included Robert Christensen and William Eustis, two Wachovia bankers who were the people listed as officers of TW.

68.     McClendon subsequently (in 2008) sold another VPP through Wachovia for $88 million.  This sale was to an entity called Blue Devil Trust which designated Wells Fargo as the "owner trustee" and bankers Christensen and Eustis as officers.  As the Wall Street Journal reported on April 27, 2012, Wells Fargo has served as a financial advisor to Chesapeake on 10 transactions since 2005 valued at nearly $9.9 billion combined.  Additionally, Wells Fargo provided a loan to McClendon in 2010.

69.     However, during the Class Period, the Company concealed McClendon's personal dealings with these banks and private equity groups, as well as the risk that Chesapeake's business partners such as EIG, Bank of America, Wells Fargo and Goldman Sachs were being chosen to advance McClendon's personal interests rather

21

than the best interests of Chesapeake, and that those doing business with McClendon personally were able to extract positions in lucrative Chesapeake offerings and investment transactions with the Company.

### D.   CHESAPEAKE ENTERS NUMEROUS VPPS WHICH SADDLE THE COMPANY WITH $1.4 BILLION IN UNDISCLOSED LIABILITIES

70.     While McClendon was borrowing money and entering into his own VPP transactions to raise funds, the Company was struggling with it own debt which had mushroomed under McClendon's aggressive expansion program. In order to deal with that debt, the Company entered into its own VPP deals.  However, the Company did not want the obligations from these deals to negatively impact its credit rating and thereby impair its ability to raise funds in the capital markets.   Accordingly, Chesapeake concealed its huge liability under its VPP transactions.

71.     On May 10, 2012, the Wall Street Journal reported that as a result of VPPs entered into by Chesapeake, the Company was saddled with about $1.4 billion of previously unreported liabilities over the next decade through these off-balance-sheet financial deals.  Like McClendon's own VPPs, these deals by the Company are long-term commitments requiring it to deliver specific amounts of oil and gas each month.  The Company's deals last until 2022.

72.     A Wall Street Journal review of 10 VPP documents (filed in county courthouses in four states) shows that Chesapeake's liability is far larger than previously believed by investors and analysts (who had estimated a total value of around $600 million for the VPPs).  According to the Wall Street Journal, the costs to Chesapeake

amount to $300 million in 2012 and $270 million in 2013, plus another $800 million between 2014 and 2022. The amount of oil and gas it has pledged for this year and next equals about 15% of Chesapeake's expected production through the end of 2013.

73.    The recent disclosures about McClendon's and the Company's VPPs demonstrate that Chesapeake's Class Period representations about its debt were materially false and incomplete because the indebtedness figures did not include Chesapeake's liabilities under its VPP agreements. While Chesapeake periodically reported the amount of money it received in its VPPs, as well as the amount of oil and gas committed to the VPP counterparties, it did not disclose its costs to fulfill the VPPs, such as the costs to pump and deliver the oil and gas. The Wall Street Journal estimated these costs at $1.4 billion.

74.    As explained below, Defendants' failure to disclose this information violated SEC regulations. The Company's concealment of its huge liability from the VPPs is material and renders its disclosures about its long-term debt false and misleading. The VPPs are essentially debts with interest payments made in fuel rather than cash, and the hidden operating costs constitute ten percent of the Company's total long-term debt. Indeed, it appears that these hidden costs jeopardized the Company's ability to comply with loan covenants, requiring Chesapeake to borrow another $4 billion.

75.    Moreover, unbeknownst to investors, the reason the Company entered into the VPPs was to address its financial strain caused by business decisions designed to further McClendon's interests rather than Chesapeake's. The Company was highly leveraged because it was in McClendon's personal interests to expand the Company's

exploration and drilling activities, as the more oil and gas reserves worth drilling that the Company found, the more McClendon stood to gain personally through his participation in the FWPP. In order to address its current and burgeoning long-term debt, the Company was forced to mortgage its future through numerous VPPs, though it concealed the reason why it entered the VPPs, as well as its growing liability associated with those deals.

### E.   MCCLENDON'S SECRET HERITAGE MANAGEMENT COMPANY HEDGE FUND

76.     On May 2, 2012, Reuters reported that for years, McClendon ran a lucrative $200 million hedge fund that traded oil and gas futures—the same commodities produced by Chesapeake. The fund, Heritage Management Company LLC ("Heritage"), was founded by McClendon and Chesapeake co-founder Tom Ward in 2004. Although it was registered in Delaware, Heritage listed its headquarters as the same Oklahoma City address where Chesapeake is headquartered. The two companies also shared employees; for example, John D. Garrison, Chesapeake's executive business manager was also Heritage's Chief Financial Officer.

77.     Reuters has reported that McClendon engaged in "near daily" communications and "exhaustive" calls from his Chesapeake headquarters to direct and manage Heritage's hedging and trading operations. McClendon did not just use Heritage to trade for himself, but also for his friends and associates. Reuters reported that McClendon profited by charging a flat 2% of total asset value as a management fee and an additional 20% of any profits to investors.

78.    The Company still allows McClendon to engage in hedging activities personally or through other entities.   As reported by Reuters on May 8, 2012, McClendon's employment agreement with Chesapeake was revised in 2009 to ban McClendon from taking an active role in a hedge fund, but it still allows McClendon to trade in commodities.   The 2009 contract (which extends for five years) permits McClendon to trade in a range of financial instruments, including commodities, "short positions, long positions or positions in options" in both futures and over-the-counter markets.

79.    McClendon's contract gives him considerably more latitude for outside ventures than his subordinates are allowed – Chesapeake's contracts with at least four other senior executives say the executives may not "engage in other business activities independent of" Chesapeake, and explicitly ban the executives from serving "as a general partner, officer, executive, director or member of any corporation, partnership, company or firm."

80.    The 2009 employment agreement also states that McClendon could put cash into a "passive investment entity," including a hedge fund, provided it "does not actively engage in [exploration and production] activities," and "for which [McClendon] does not directly or indirectly provide input, advice or management."

81.    These 2009 revisions to McClendon's employment agreement accomplish little, as hedge funds such as Heritage typically invest funds but do not actively manage or engage in the business of the entities in which they invest.  It is unlikely that a hedge fund would itself engage in exploration or production activities, and Heritage is not

reported to have engaged in any such activities.  Moreover, the revisions to McClendon's employment agreement show that the Chesapeake Board was aware of McClendon's Heritage fund, or at least his interest to continue trading in gas and oil commodities. However, neither the Heritage fund nor McClendon's private hedging activities were disclosed in any of Chesapeake's prior public filings.

82.     While the Company discussed its own hedging activities and derivative positions, it did not disclose that McClendon had been engaging, and was still permitted to engage, in hedging, had his own positions in derivatives, and was (or had been) making personal trades in the same commodities that the Company was selling and hedging.

83.     McClendon's trading presented risks to the Company and its shareholders in that the CEO and Chairman could direct the Company's derivative positions in a manner that would serve to benefit McClendon rather than the Company.  In fact, there was a risk that McClendon could actually bet against the Company's interests.  For example, McClendon's first-hand knowledge of Chesapeake's plans to trade would have allowed him to profit by trading ahead of Chesapeake, raising costs for the Company. This possibility was extremely problematic because hedging generated significant revenue for the Company.  However, these risks were kept secret from investors.

## V.     THE TRUTH IS REVEALED THROUGH A SERIES OF CORRECTIVE DISCLOSURES

84.     During the Class Period, Defendants' scheme worked, as vast corporate wealth was transferred to McClendon, and McClendon was able to hedge the Company

assets he obtained, and manipulate the Company's business, to serve his personal interests rather than those of the Company.   However, through a series of corrective disclosures beginning on April 18, 2012, investors gradually learned that the reason the Company had greatly expanded its exploration and driving activities was to provide increasing amounts of assets and profits to McClendon through the FWPP program, while burdening the Company with crippling amounts of debt and expenses.   Investors likewise learned that the Board did nothing to stop this piracy, and instead allowed McClendon to run a competing hedging business out of his Chesapeake office, use Company bankers, lawyers and employees for his personal transactions, and obtain multi-hundred million dollar personal loans from banks that were, at the same time, chosen by McClendon to invest in Company operations.

85.   The Defendants concealed those facts, the risks they posed to the Company, and the Company's resulting huge liabilities and overall debt, from investors.

86.   On April 18, 2012, Reuters published the first of a series of articles that shocked the market with news about numerous conflicts of interest confronting McClendon and the Company's undisclosed debt levels.   That day, Reuters disclosed that McClendon had borrowed $1.1 billion on his FWPP well interests, an amount later revealed to be $1.55 billion.   In response, the Company's stock sank 5.5%, going from $19.12 on April 17 to $18.06 on April 18.

87.   On April 26, 2012, Reuters reported that the SEC commenced an informal inquiry of Chesapeake.   That day, Chesapeake announced that its Board had "determined" not to extend the FWPP "beyond its present 10-year term ending December

27

31, 2015" and that the Board and McClendon "have committed to negotiate the early termination of the FWPP and the amendment to Mr. McClendon's employment agreement necessary to effectuate the early termination."  The Company later disclosed that it had reached an agreement with McClendon on the early termination, agreeing to end the program on June 30, 2014.

88.    On May 2, 2012, Reuters reported that McClendon had for years been running the Heritage hedge fund.  The Company announced that day that it was separating the positions of Chairman of the Board and CEO, stripping McClendon of his Chairman position.

89.    On May 10, 2012, the Wall Street Journal disclosed that the Company had an additional $1.4 billion in previously unreported liabilities through off-balance-sheet VPPs.  And on May 11, 2012, Chesapeake disclosed in its Form 10-Q filed that day that it might delay asset sales to preserve cash flow needed to comply with the requirements of various loans.

90.    Chesapeake later revealed that it had reached agreement with a unit of Goldman Sachs Group, Inc. and affiliates of Jefferies Group Inc. on a $4 billion loan to help ease a cash shortfall that, the Company said, threatens to curtail its development of oil and gas wells.  The loan comes at a steep 8.5% interest rate that rises to more than 11% if the Company does not pay it off by the end of the year.

91.    As Bonnie Baha, portfolio manager at DoubleLine (which oversees $34 billion in assets under management) commented, "Chesapeake is forced to issue debt at higher levels than ever with incredibly onerous terms in an interest rate environment

that's the lowest most of us have ever seen in our lifetimes. … It's absolutely untenable."
Similarly, Sabur Moini, manager of a $2.5 billion high-yield-bond portfolio at Payden &
Rygel, stated that the $4 billion loan "was priced very attractively" for the lenders, rather
than Chesapeake, adding that turmoil in Chesapeake's bonds was largely "self-inflicted."

92.     This is the third time since 2011 that the Company has taken on debt to pay
down a credit line, at an increasing cost.  In February, Chesapeake issued $1.3 billion in
senior notes due in 2019 for 6.78%, while a year earlier it sold $1 billion of senior notes
due on 2021 for 6.13%.

93.     The Company stated that it plans to repay the recent $4 billion short-term
loan with part of the proceeds from as much as $11.5 billion in asset sales planned for the
remainder of the year.  Reportedly first in line is the Company's holdings in the West
Texas Permian Basin, one of the most prolific U.S. energy regions, which could bring up
to $7 billion, according to analysts from Canaccord Genuity.  As SunTrust Robinson
Humphrey analyst Neal Dingmann commented, Chesapeake "is running out of financial
options and everybody knows they need to do some deals, [and] the closer they get to that
point the more nervous everybody is going to get."

94.     As a result of these recent and various prior disclosures, Chesapeake's
stock price has plunged to its lowest level in more than three years, dropping to close on
May 11 at $14.81.  Since April 17, 2012, when it closed at $19.12 per share, the stock has
dropped about 23%.  Additionally, the Company's previously-investment-grade level
debt rating dropped, as Moody's changed its rating outlook for the Company to negative,
rated Chesapeake's "Corporate Family Ratings" at Ba2 (two levels below investment

grade), and rated Chesapeake's senior unsecured debt at Ba3. Similarly, S&P and Fitch each cut their rating on the Company's credit another notch into non-investment, or junk status, to BB-. McClendon's $1.55 billion "loan scandal" has "severely tainted the company" said Marc Gross, a money manager at RS Investments in New York who oversees $3 billion in fixed-income funds, including Chesapeake bonds. "There is no chance of an IG rating" over the next three years, he said, adding that the Company is "more likely to get downgraded than upgraded."

## VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND/OR MATERIAL OMISSIONS DURING THE CLASS PERIOD

### A. CHESAPEAKE'S MISLEADING STATEMENTS REGARDING THE FWPP

95.     During the Class Period, Chesapeake disclosed the existence of the FWPP but failed to disclose that McClendon had pledged his well assets to secure over a billion dollars in personal loans, and falsely represented that the FWPP aligned the interests of McClendon and the Company.

96.     The Company disclosed the existence of the FWPP in its Form 10-K filings throughout the Class Period, stating:

> Mr. McClendon may elect to participate in all or none of the wells drilled by or on behalf of Chesapeake during a calendar year, but he is not allowed to participate only in selected wells. A participation election is required to be received by the Compensation Committee of Chesapeake's Board of Directors not less than 30 days prior to the start of each calendar year. His participation is permitted only under the terms outlined in the FWPP, which, among other things, *limits his individual participation to a maximum working interest of 2.5%* in a well and *prohibits participation in situations where Chesapeake's working interest would be reduced below 12.5% as a result of his participation.* In addition, the *company is reimbursed for costs associated with leasehold acquired by Mr. McClendon* as a result of his well participation.

30

These disclosures concerning the FWPP were made in the Company's March 2010 10-K; the March 2011 10-K and the February 2012 10-K.

97.     The Company also stated in a section in the February 2012 10-K titled "Disclosures About Effects of Transactions with Related Parties," that:

> From time to time, Mr. McClendon has sold his FWPP interests in conjunction with sales by the Company of its interests in the same properties, and the proceeds related to those sales have been allocated between Mr. McClendon and the Company based on their respective ownership interests and on the same terms as those that applied to the Company's properties included in the sale.

98.     The Company's statement that McClendon's sales of FWPP interests were "in conjunction with the sales by the Company of its interests in the same properties" was false and misleading because, at the time when Chesapeake made this disclosure, the Defendants knew or were extremely reckless in not knowing that McClendon had pledged his well assets to third parties as collateral for over a billion dollars in loans, and those third parties stood to take possession of those interests should McClendon default. Contrary to Chesapeake's public filings, McClendon's pledging of his well interests was not in conjunction with any sales by the Company.

99.     During the Class Period, Chesapeake falsely stated that the FWPP served to align McClendon's interests with the interests of the Company.  The Company stated in its  Form 14A Proxy Statement filed April 30, 2009 (the "2009 Proxy Statement") and the Form 14A Proxy Statement filed April 30, 2010 (the "2010 Proxy Statement") that:

> The FWPP fosters and promotes the development and execution of the Company's business by (a) retaining and motivating our CEO who co-founded the Company; (b) aligning the financial rewards and risks of Mr. McClendon with the Company more effectively and directly than other

31

performance incentive programs maintained by more of the Company's peers; and (c) imposing on Mr. McClendon the same risks incurred by the Company in its exploration and production operations. The Compensation Committee reviews Mr. McClendon's participation in the FWPP on a semi-annual basis and periodically adjusts the acreage costs charged to Mr. McClendon to ensure his reimbursements reflect the Company's recent acreage activities.

Similar disclosures appear in the Company's Form 14A Proxy Statement filed April 29, 2011 (the "2011 Proxy Statement).

100.    The Company also disclosed, in the February 2012 10-K, in a section titled "other commitments" that:

Certain of our natural gas and oil properties are burdened by non-operating interests such as royalties, overriding royalties and volumetric production payments. As the holder of the working interest from which such interests have been carved, we have the responsibility to bear the cost of developing and producing the reserves attributable to such interests.

101.    The Company's disclosures that the FWPP "fosters and promotes the development and execution of the Company's business" by "aligning the financial rewards and risks of Mr. McClendon with the Company" were materially (and patently) false. Defendants knew, or were extremely reckless in not knowing, that in fact and practice, the FWPP advanced the personal interests of McClendon rather than the best interests of the Company, and facilitated the transfer of Company assets (obtained under the FWPP) to third parties whose interests were not the same as the Company's. Additionally, as Defendants knew or were extremely reckless in not knowing, the FWPP allows McClendon to participate in lucrative Company wells without incurring the up front exploration costs, guaranteeing him better overall opportunities and better returns

than Chesapeake's shareholders; thus, the FWPP does not align the "financial rewards and risks of Mr. McClendon with the Company."

102.    Similarly, the Company's statement that the FWPP "impos[es] on Mr. McClendon the same risks incurred by the Company in its exploration and production operations" is false, because as Defendants knew, or were extremely reckless in not knowing, the Company, but not McClendon, assumes the costs associated with the exploration, development and testing of wells; McClendon only pays his pro-rata share of the costs to extract and deliver the oil and gas from drilled wells that are part of the FWPP program.   The Company's statement that the Compensation Committee "periodically adjust the acreage costs charged to Mr. McClendon to ensure his reimbursements reflect the company's recent acreage activities" is false and misleading because McClendon is not charged for any acreage costs or activities related to the acquisition of land and exploration and testing activities where wells were not drilled.

103.    Likewise, due to the misalignment of McClendon's and the Company's interests, the Defendants knew, or were extremely reckless in not knowing, that the FWPP does not "foster[] and promote[] the development and execution of the Company's business" because the FWPP gave McClendon an incentive to expand the Company's exploration and drilling program to increase the number of wells transferred to him, thereby serving his own interests rather than the best interests of the Company.

**B.      FALSE AND MISLEADING STATEMENTS REGARDING TRANSACTIONS WITH FINANCIAL INSTITUTIONS**

104.    During the Class Period, Chesapeake engaged in transactions with banks and private equity funds and other entities without disclosing that those entities were, or had been, also doing business with McClendon.

105.    For example, in a November 4, 2011 press release, the Company discussed its Utica shale financing as involving the issuance of preferred shares that "are entitled to receive an initial annual distribution of 7%, payable Quarterly," such financing allowing Chesapeake to "drill a minimum of 50 net wells per year through 2016" in the area "up to a minimum cumulative total of 250 net wells."  Additionally, during a third quarter 2011 earning conference call held on November 4, 2011, McClendon discussed and responded to questions concerning EIG's role in this  transaction:

> In addition, we are very pleased to report our Utica financial transaction led by EIG. This is a $500 million preferred equity transaction in a subsidiary that holds about 45% of our Utica leasehold. By the end of the month, we expect this will have grown to become a $1.25 billion transaction.

106.    The Company discussed the Utica financial transaction in its February 2012 10-K:

> CHK Utica, L.L.C. (CHK Utica) is an unrestricted, non-guarantor consolidated subsidiary we formed in October 2011 to develop a portion of our Utica Shale natural gas and oil assets.  In exchange for all of the common shares, we contributed to CHK Utica approximately 700,000 net acres of leasehold within an area of mutual interest in the Utica Shale play covering 13 counties located primarily in eastern Ohio.  During November and December 2011, in private placements, third-party investors contributed $1.25 billion in cash to CHK Utica in exchange for (i) 1.25 million CHK Utica preferred shares, and (ii) our obligation to deliver a 3% overriding royalty interest (ORRI) in up to 1,500 net wells to be drilled on certain of our Utica Shale leasehold.  Dividends on the

34

preferred shares are payable on a quarterly basis at a rate of 7% per annum based on $1,000 per share.  This dividend rate is subject to increase in limited circumstances in the event that, and only for so long as, cash flow from the assets owned by CHK Utica are insufficient to fund the dividend in full in any quarter.  We have committed to drill, for the benefit of CHK Utica, a minimum of 50 net wells per year through 2016 in the CHK Utica area of mutual interest, up to a minimum cumulative total of 250 net wells. As the managing member of CHK Utica, we may, at our sole discretion and election at any time after December 31, 2013, distribute certain excess cash of CHK Utica.

107.    As Defendants knew, or were extremely reckless in not knowing, the disclosures about the Utica shale transaction and EIG's role were false and misleading because there was no disclosure that EIG was also separately loaning McClendon hundreds of millions of dollars.  As the "managing member of CHK Utica," Chesapeake ensured that the transaction was "led by EIG," but did not disclose that this arrangement was based in part on EIG's undisclosed role in providing hundreds of millions of dollars in financing to McClendon.

108.    Similarly, Chesapeake made other disclosures about transactions that were false and misleading because Chesapeake disclosed the roles of Wells Fargo Bank, Bank of America and Goldman Sachs in those transactions but failed to disclose the roles those entities had in private business dealings with McClendon.

109.    Chesapeake disclosed in an 8-K filed with the SEC on June 17, 2009 the role of Wells Fargo in a hedging facility, stating:

> On June 11, 2009, Chesapeake Energy Corporation ("Chesapeake") entered into a perpetual Multi-Counterparty Secured Hedging Facility (the "Hedge Facility") with 13 institutions, as Initial Hedge Counterparties ("Hedge Counterparties"), with Barclays Bank PLC serving as the Hedge Facility Calculation Agent and Wells Fargo Bank, National Association serving as the Hedge Facility Collateral Agent.

110.   Chesapeake disclosed in a September 24, 2009 press release, later attached to an 8-K filed with the SEC on September 29, 2009, that it had entered into a joint venture with Global Infrastructure Partners and that Wells Fargo had served as a "lead arranger" for two related lending agreements with Chesapeake:

> Chesapeake Energy Corporation (NYSE:CHK) today announced it has entered into a definitive agreement to form a joint venture on a portion of its midstream assets with Global Infrastructure Partners (GIP), a New York-based private equity fund.  As part of the transaction, Chesapeake will contribute certain natural gas gathering and processing assets into a new entity, Chesapeake Midstream Partners, L.L.C. (CMP), and GIP will purchase a 50% interest in CMP.  Chesapeake will retain the remaining 50% interest in CMP and receive $588 million in cash from GIP.
>
> \*   \*   \*
>
> Concurrent with GIP's funding of its interest in the joint venture, CMP is scheduled to close a new $500 million secured revolving bank credit facility agreement that matures in September 2012.  CMP plans to utilize the facility to partially fund capital expenditures associated with the building of additional natural gas gathering systems and for general corporate purposes.  Additionally, Chesapeake will amend and restate the existing lending agreement on its midstream assets to reduce the total capacity from $460 million to $250 million, among other changes.  ***This separate secured revolving bank credit facility will support CMD's continuing midstream activities.  Wells Fargo Bank and RBS Securities, Inc. served as lead arrangers for the two separate bank credit facilities....***

111.   Chesapeake disclosed in an August 9, 2010 press release that was later attached to an 8-K filed with the SEC on August 12, 2010 that it was commencing a public offering of certain Senior Notes and that Bank of America and Wells Fargo would serve as joint book-running managers on the offering:

> The offering consisted of $600 million of Senior Notes due 2018, which carry interest at a rate of 6.875% per annum, and $1.4 billion of Senior Notes due 2020, which carry interest at a rate of 6.625% per annum.  …  Credit Suisse Securities (USA) LLC, Bank of America Securities LLC,

Barclays Capital, Inc., Morgan Stanley & Co. Incorporated and Wells Fargo Securities, LLC acted as joint book-running managers for the senior notes offering.

112.    In a press release on February 8, 2011, later attached to an 8-K filed with the SEC on February 9, 2011, Chesapeake announced a public offering of Senior Notes and that Wells Fargo would serve as a joint book-running manager for the offering:

> Chesapeake Energy Corporation (NYSE:CHK) today announced that it is commencing a public offering of $1.0 billion of Senior Notes due 2011. … Morgan Stanley & Co. Incorporated and Wells Fargo Securities, LLC will act as joint book-running managers for the offering.

113.    Chesapeake disclosed in a May 9, 2011 press release, later attached to an 8-K filed with the SEC on May 12, 2011, that it had entered into a recapitalization of another company, Frac Tech Holdings, LLC, in a transaction in which Bank of America Merrill Lynch served as a financial advisor to Chesapeake:

> Chesapeake Energy Corporation (NYSE:CHK) today announced the completion of a recapitalization of privately held Frac Tech Holdings, LLC. In the transaction,. Chesapeake supported a consortium of investors …. In the recapitalization, Chesapeake received a cash distribution of approximately $200 million and increased its ownership to 30%. Approximately $1.7 billion of debt financing was arranged to partially fund the consortium's acquisition and the distribution to Chesapeake.  Bank of America Merrill Lynch and Citigroup served as financial advisors to Chesapeake ….

114.    Chesapeake disclosed in an 8-K filed with the SEC on May 14, 2012 that it had received financing from Goldman Sachs, stating:

> On May 11, 2012, Chesapeake Energy Corporation (the "Company") entered into a Credit Agreement (the "Term Loan Credit Agreement") among the Company, as Borrower, Goldman Sacks Bank USA, as Administrative Agent, and Jefferies Finance LLC, as Syndication Agent, that provides for an aggregate term loan commitment of $3.0 billion.

115.    In an 8-K filed with the SEC on Mary 17, 2012, Chesapeake stated that it had amended the Term Loan Credit Agreement with Goldman Sachs Bank USA still serving "as Administrative Agent."

116.    In a November 2, 2011 press release, later attached to an 8-K filed with the SEC on November 4, 2011, Chesapeake announced an initial public offering of units in its affiliate, Chesapeake Granite Wash Trust, with Goldman, Sachs & Co. and Wells Fargo Securities, LLC serving as joint book-running managers:

> Chesapeake Energy Corporation (NYSE:CHK) announced today that Chesapeake Granite Wash Trust (the "Trust") has commenced an initial public offering of 23,375,000 common units representing an approximate 50% beneficial interest in the Trust. … Goldman, Sachs & Co. and Wells Fargo Securities, LLC will serve as joint book-running managers.

117.    In a February 13, 2012 press release, later attached to an 8-K filed with the SEC on February 17, 2012, Chesapeake announced an offering of certain Senior Notes, with Goldman, Sachs & Co. serving as a joint book-running manager:

> Chesapeake Energy Corporation (NYSE:CHK) today announced that it has priced its previously announced public offering of $1.3 billion principal amount Senior Notes due 2019, which will carry an interest rate of 6.775% per annum. … The notes were offered pursuant to an effective shelf registration statement filed August 3, 2010 with the U.S. Securities and Exchange Commission. … Bank of America Merrill Lynch, Deutsche Bank Securities Inc., Goldman Sachs & Co., Morgan Stanley & Co. LLC and RBS Securities Inc. acted as joint book-running managers for the offering.

118.    In an April 16, 2012 press release, later attached to an 8-K filed with the SEC on April 20, 2012, Chesapeake announced "that its wholly owned service industry affiliate, Chesapeake Oilfield Services, Inc., has filed a registration statement relating to an initial public offering of shares of its Class A common stock."

119.    The Form S-1 Registration Statement for the offering filed with the SEC on

April 16, 2012 stated:

> Goldman, Sachs & Co., and Merrill Lynch, Pierce, Fenner & Smith
> Incorporated are the representatives of the underwriters.
>
> *    *    *
>
> [A]ffiliates of Goldman, Sachs & Co. and Merrill Lynch, Pierce, Fenner &
> Smith Incorporated are lenders under our revolving bank credit facility and
> under Chesapeake's corporate revolving bank credit facility and will, thus,
> receive a portion of the net proceeds from this offering through the
> repayment of borrowings outstanding under such credit facilities.  In
> addition, an affiliate of Merrill Lynch, Pierce, Fenner & Smith Incorporated
> is a lessor under master lease agreements pursuant to which a portion of our
> drilling rig fleet is leased.

120.    Additionally, the related prospectus listed Goldman Sachs and Bank of

America as underwriters.

121.    Each of these disclosures about the offerings and other transactions and the

roles of EIG, Wells Fargo, Goldman Sachs and Bank of America (and their affiliates)

were false and misleading because, as Defendants knew, or were extremely reckless in

not knowing, there was no disclosure that those entities were lending money personally to

McClendon and/or had engaged or were also engaging in private business dealings with

McClendon, nor any disclosure of the risk that those entities had leveraged their roles in

such private dealings with McClendon in order to obtain roles in transactions with the

Company, or that McClendon had arranged for those entities to do business with

Chesapeake as a *quid pro quo* for doing business with him.

122.    As the Wall Street Journal disclosed, McClendon had received his own

financing from EIG, Bank of America and Goldman Sachs.  Additionally, as Bloomberg

reported, McClendon had entered VPP deals with Wells Fargo (which served as the "owner trustee" of Blue Devil Trust, which purchased a VPP from McClendon). Thus, all of the Company's disclosures about its transactions involving EIG, Wells Fargo, Goldman Sachs and Bank of America were false and misleading because, as Defendants knew, or were extremely reckless in not knowing, there was no disclosure that those entities were also lending to or doing business with McClendon, and that, in exchange for favorable terms in his personal dealings with those entities, McClendon appears to have arranged for those entities to participate in transactions with the Company, or any disclosure of the risk that this exchange occurred.

### C. FALSE AND MISLEADING STATEMENTS REGARDING THE HEDGING PROGRAM

123. During the Class Period, Chesapeake disclosed that it engaged in hedging activities and discussed the concomitant risks posed to the Company from such activities, but did not disclose that McClendon was also engaged in hedging oil and gas, nor the risks to the Company posed by McClendon's activities.

124. In the Company's February 2012 10-K, the Company disclosed:

Our results of operations and operating cash flows are impacted by changes in market prices for oil and natural gas. To mitigate a portion of the exposure to adverse market changes, we have entered into various derivative instruments. Executive management is involved in all risk management activities and the Board of Directors reviews the Company's hedging program at its quarterly board meetings. . . . Hedging allows us to predict with greater certainty the effective prices we will receive for our hedged production.

\*   \*   \*

We adjust our derivative positions in response to changes in prices and market conditions as part of an ongoing dynamic process.

The Company made substantially similar disclosures about its hedging activities in its other 10-Ks filed during the Class Period.

125.    Additionally, in the "Risk Factors" section of its February 2012 10-K, the Company stated: "Our hedging activities may reduce the realized prices received for our natural gas and oil sales, require us to provide collateral for hedging liabilities and involve risk that our counterparties may be unable to satisfy their obligations to us."  The Company added:

> Derivative transactions involve the risk that counterparties, which are generally financial institutions, may be unable to satisfy their obligations to us. Although the counterparties to our multi-counterparty secured hedging facility are required to secure their hedging obligations to us under certain scenarios, if any of our counterparties were to default on its obligations to us under the hedging contracts or seek bankruptcy protection, it could have an adverse effect on our ability to fund our planned activities and could result in a larger percentage of our future production being subject to commodity price changes. The risk of counterparty default is heightened in a poor economic environment.

126.    McClendon affirmatively stated that he was not involved in any private hedging activities.  As reported by Reuters (in a May 2, 2012 article), when McClendon was asked whether he traded for himself in energy markets, McClendon stated:  "No, no, no. I am part of Chesapeake's hedging committee."

127.    These disclosures were all false and misleading because they did not reveal that McClendon had been, and still is operating (or at least is permitted to operate) his own hedging business and/or making his own personal trades in the same commodities (oil and gas) that the Company was hedging.  At the time these disclosures were made,

the Defendants knew, or were extremely reckless in not knowing, that McClendon had previously engaged in his own hedging business and was still hedging, or at least permitted to do so.

128. Similarly, these disclosures were false and misleading because the Company's own derivative contracts had been impacted and thereby "adjusted" as a result of McClendon's own personal trading in the same derivatives traded by the Company.

129. Moreover, the Company's discussion of the various risks by the Company's hedging and derivatives trading was false and misleading because there was no disclosure of the risks McClendon's trading presented to the Company, including the risks that McClendon could direct the Company's derivative positions in a manner that would serve to benefit McClendon rather than the Company, or that McClendon could actually bet against the Company's interests.

130. Likewise, the discussion of the possible ramifications from a default by the Company's hedging counterparties was materially false due to the failure to discuss the possible ramifications of the default by McClendon's own hedging counterparties. As Defendants knew, or were extremely reckless in not knowing, such a default could force McClendon to liquidate his Chesapeake stockholdings, potentially causing a decline in the Company's stock price, and/or force McClendon to liquidate his well interests, thereby placing the Company's assets in the hands of third parties whose interests are different and diverge from those of the Company.

**D.** **FALSE AND MISLEADING STATEMENTS REGARDING THE COMPANY'S BUSINESS STRATEGY**

131.   Throughout the Class Period, Chesapeake has represented that its business strategy is to greatly expand its oil and gas program through the acquisition of land and drilling rights and the drilling of new wells.  What Chesapeake failed to disclose was that this business strategy was designed to benefit McClendon rather than serve the best interests of the Company.

132.   In the Company's February 2012 10-K, the Company stated:

Business Strategy

Since our inception in 1989, Chesapeake's primary goal has been to create value for investors by building and developing one of the largest onshore natural gas and liquids-rich resource bases in the U.S.  Key elements of this business strategy are further explained below.

Growth through the Drillbits.   We believe that our most distinctive characteristic is our commitment and ability to grow production and reserves organically through the drillbit in areas with large unconventional accumulations of natural gas, oil and NGLs.  We are currently utilizing 161 operated drilling rigs and 100 non-operated drilling rigs to conduct the most active drilling program in the U.S.  We are active in most of the nation's major unconventional plays, where we drill more horizontal wells than any other company in the industry.  For many years, we have been actively investing large amounts of capital in leasehold, three-dimensional (3-D) seismic information and human resources to take full advantage of our capacity to grow through the drillbit.  We are one of the few large-cap independent natural gas and oil companies that have been able to consistently increase production, which we have successfully achieved for 22 consecutive years.  We believe the key elements of the success and scale of our drilling programs have been our recognition earlier than most of our competitors that advanced horizontal drilling and completion techniques would enable development of previously uneconomic natural gas and liquid-rich reservoirs and that, as a consequence, various unconventional formations could be recognized and developed as potentially prolific

43

reservoirs.  In response to our early recognition of these trends, we have proactively hired thousands of new employees and have built what we believe is the largest combined inventory of onshore leasehold and 3-D seismic in the U.S.  These are the building blocks of our successful large-scale drilling program and the foundation of value creation for our company.

Control Substantial Land and Drilling Location Investories.  After we identified the trends discussed above, we initiated a plan to build and maintain the largest inventory of onshore drilling opportunities in the U.S.  Recognizing that better horizontal drilling and completion technologies, when applied to various new unconventional reservoirs, would likely create a unique opportunity to capture decades worth of drilling opportunities, we embarked on an aggressive lease acquisition program, which we have referred to as the "gas shale land grab" of 2006 through 2008 and the "unconventional oil land grab" of 2009 through 2011.  We believed that the winner of these land grabs would enjoy competitive advantages for decades to come as other companies would be locked out of the best new unconventional resource plays in the U.S.  We believe that we have executed our land acquisition strategy with particular distinction. At December 31, 2011, we held approximately 15.3 million net acres of onshore leasehold in the U.S. and have identified approximately 39,200 drilling opportunities on this leasehold.

The Company made substantially similar disclosures in its March 2010 10-K and March

2011 10-K.

133.    As the Company reported in its February 2012 10-K, the Company has

grown significantly as a result of its business strategy, stating:

We are the second-largest producer of natural gas, a top 15 producer of liquids and the most active driller of new wells in the U.S.  We own interests in approximately 45,700 producing natural gas and oil wells that are currently producing approximately 3.5 bcfe per day, net to our interest . . . . Since 2000, Chesapeake has built the largest combined inventories of onshore leasehold (15.3 million net acres) and 3-D seismic (30.8 million acres) in the U.S.  We have accumulated the largest inventory of U.S. natural gas shale play leasehold (2.2 million net acres) and own a leading position in 11 of what we believe are the top 15 unconventional liquids-rich plays in the U.S.  We are currently using 161 operated drilling rigs to further develop our inventory of approximately 39,200 net drillsites.  The

company is targeting to invest approximately $1.4 billion in net undeveloped leasehold expenditures in 2012, of which approximately 90% will be in liquids-rich plays and 100% will be in plays where the company is already active.  This compares to net undeveloped leasehold expenditures of approximately $3.5 billion and $5.8 billion in 2011 and 2010, respectively.

134.    The Company identified the "key elements" of its business strategy as the following:

- growing production and proved reserves through the drillbit;

- controlling substantial land and drilling location inventories and building operating focus and scale;

- developing proprietary technological advantages;

- focusing on achieving low costs through our focused activities, vertical integration and increasing scale;

- mitigating natural gas and oil price risk through our hedging program;

- entering into value-creating joint ventures;

- improving our balance sheet through reduction of debt;

- transforming the U.S. transportation fuels market and increasing demand for U.S. natural gas; and

- maintaining an entrepreneurial culture.

The Company made similar disclosures in its prior 10-K filings during the Class Period.

135.    In a May 5, 2010 earnings conference call, McClendon attempted to explain why Chesapeake continues to commit resources to drilling despite the risks. McClendon stated:

Well, it's completely dependent upon gas prices, and to a lesser extent oil prices. I mean, right now, as I have stated on numerous occasions, at least half, and probably two–thirds or three-quarters of our gas drilling is what I would call involuntary. It's being incentivized by something other than the gas price. It might be the realization of a carry in the Eagle Ford – sorry, in the Marcellus or in the Barnett. It might be the need to hold acreage in the Haynesville, for example, or could be a combination of those 2 things. And I think that's in large part true across the industry, that there's an enormous amount of drilling today that is economic. It's just economic for reasons other than what current gas prices are.

136.    On various investor calls, the Company stressed that its business would continue to expand by acquiring land and drilling more wells.  In the Company's February 22, 2012 earnings call, Dominic Dell'Osso stated that the Company had decided to "stay the course" in "executing on two of [Chesapeake's] primary goals in 2012: increasing oil and liquids production and decreasing [the Company's] financial leverage."

137.    The Company's disclosures of its business strategy, McClendon's explanation for the reasons why the Company engaged in gas drilling, Dell'Osso's articulation of the Company's goal to increase production, and the Company's statements about the number of its gas and oil wells and inventory, were all false and misleading, as there was no disclosure that a key element of the Company's business strategy was to expand its exploration and drilling program in order to transfer more Company assets to McClendon, and the reason the Company owned so much land and so many wells was to increase the size of McClendon's stake in Company wells.  As Defendants knew, or were extremely reckless in not knowing, the disclosures were false and misleading because they failed to disclose that the FWPP program incentivized McClendon to over-extend the Company's exploration and drilling activities, and that the Company's huge growth

(at considerable expense) was designed, at least in part, to benefit McClendon personally rather than advance the best interests of Chesapeake.

### E.   FALSE AND MISLEADING STATEMENTS REGARDING CHESAPEAKE'S INDEBTEDNESS

138.   In its public filings throughout the Class Period, the Company disclosed its level of indebtedness.  For example, in the Company's March 2010 10-K, the Company stated:

> As of December 31, 2009, we had long-term indebtedness of approximately $12.3 billion, and our net indebtedness represented 49% of our total book capitalization. We had $1.936 billion and $1.250 billion of outstanding borrowings drawn under our revolving bank credit facilities at December 31, 2009 and February 26, 2010, respectively.

139.   In the March 2011 10-K, the Company stated that:

> As of December 31, 2010, we had long-term indebtedness of approximately $12.6 billion, and our net indebtedness represented 45% of our total book capitalization, which we define as the sum of total Chesapeake stockholders' equity and total current and long-term debt less cash. We had $3.706 billion of outstanding borrowings drawn under our revolving bank credit facilities at December 31, 2010.

140.   In the February 2012 10-K, the Company stated:

> As of December 31, 2011, we had long-term indebtedness of approximately $10.626 billion and unrestricted cash of $351 million, and our net indebtedness represented 38% of our total book capitalization, which we define as the sum of total Chesapeake stockholders' equity and total current and long-term debt less unrestricted cash. We had $1.749 billion of outstanding borrowings drawn under our revolving bank credit facilities at December 31, 2011.

141.   In addition, each of these 10-Ks stated that:

> General economic conditions, natural gas and oil prices and financial, business and other factors affect our operations and our future performance. Many of these factors are beyond our control.

142.    The February 2012 10-K also discussed various "Risk Factors," including

the following:

> Our level of indebtedness may limit our financial flexibility [and] [t]he
> decline in general economic, business and industry conditions since 2008
> and the current economic uncertainty may have a material adverse effect on
> our results of operations, liquidity and financial condition….

The Company made similar disclosures in its prior 10-Ks filed during the Class Period.

143.    The Company's statements about indebtedness were false and misleading

because, as Defendants knew, or were extremely reckless in not knowing, the

indebtedness figures did not include Chesapeake's liabilities under its VPP agreements.

As recently reported, these Chesapeake liabilities are approximately $1.4 billion.

144.    The Company's disclosures about its long-term debt were also false and

misleading because there was no disclosure that McClendon's personal interests and

over-expansion of the Company's exploration and drilling program to benefit McClendon

played a significant role in the Company's indebtedness.   Similarly, the statements

describing the factors that "affect" Company operations and future performance, or could

cause a "material adverse effect" on Chesapeake's "results of operations, liquidity and

financial condition" were all false and misleading because the Company did not disclose

that McClendon's direction of the Company's business in order to increase his personal

stake in Company assets had increased the Company's debt and liabilities and affected its

operations and future performance.

145.    The Company's statements that its "level of indebtedness may limit [its]

financial flexibility" were false and misleading, because the Company's undisclosed

liabilities on its VPPs did, once disclosed, cause a decline in the Company's credit rating, adversely affecting its ability to obtain financing.

146.    The Company's disclosures about its VPP deals were false and misleading for the same reasons.

147.    In the March 2011 10-K, Chesapeake stated:

We completed three volumetric production payments (VPPs) in 2010, bringing the total of such transactions to eight.  The company's sixth VPP was completed in February 2010 for proceeds of approximately $180 million, or $3.95 per mcfe. In June 2010, we completed our seventh VPP for proceeds of approximately $335 million, or $8.73 per mcfe.  In September 2010, we completed our eighth VPP for proceeds of approximately $1.15 billion, or $2.93 per mcfe.  The cash proceeds from these transactions are reflected as a reduction of natural gas and oil properties with no gain or loss recognized.

148.    In the February 2012 10-K, the Company listed the VPP transactions it had completed since 2007, as follows:

| Date of VPP | Region | Proceeds ($ in millions) | Proved Reserves (bcfe) (at time of sale) | $ / mcfe | Original Term (years) |
|---|---|---|---|---|---|
| May 2011 | Mid-Continent | $153 | 177 | $4.82 | 10 |
| September 2010 | Barnett Shale | $1,150 | 390 | $2.93 | 5 |
| June 2010 | Permian Basin | $335 | 38 | $8.73 | 10 |
| February 2010 | East Texas and the Texas Gulf Coast | $180 | 46 | $3.95 | 10 |
| August 2009 | South Texas | $370 | 68 | $5.46 | 7.5 |
| December 2008 | Anadarko and Arkoma Basins | $412 | 98 | $4.19 | 8 |
| August 2008 | Anadarko Basin | $600 | 93 | $6.38 | 11 |
| May 2008 | Texas, Oklahoma and Kansas | $622 | 94 | $6.53 | 11 |
| December 2007 | Kentucky and West Virginia | $1,100 | 208 | $5.29 | 15 |

149.    These disclosures were false and misleading because there was no disclosure of the Company's liabilities associated with the VPPs.

## VII.    CHESAPEAKE'S FINANCIAL STATEMENTS FAIL TO COMPLY WITH SEC REGULATIONS

150.    During the Class Period, Chesapeake's reporting of its indebtedness was in violation of SEC Regulations.

151.    As discussed above, in disclosing its indebtedness, the Company failed to include its operating cost liabilities associated with various VPPs entered into by the Company.  This Chesapeake liability totals approximately $1.4 billion.

152.    The failure to disclose this liability violated Item 303 of SEC Regulation S-K.

153.    Item 303 requires the disclosure of "information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations," including "commitments … that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way."  17 C.F.R. 229.303(a)(1).

154.    In addition, off-balance-sheet arrangements must be disclosed that "have or are reasonably likely to have a current or future effect on the registrant's financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources" if such would be material to investors.  17 C.F.R. 229.303(a)(4).  The registrant is required to disclose all information necessary for investors to have an understanding of the off-balance-sheet arrangement, including the amounts of expenses arising from them.  Here, the Company's concealment of its huge liability from the VPPs, representing 10% of the Company's total long-term debt, is material and renders its disclosures about its long-term debt false and misleading.

## VIII.  SCIENTER

### 1.    McClendon

155.    As the driving force behind the transactions that created conflicts of interest between himself and the Company, McClendon had actual knowledge of the fraud

alleged in this Complaint.  Specifically due to McClendon's active participation he knew about the conflicts and potential risks which resulted from his investments made through the FWPP, his huge borrowings on his well interests, his Heritage fund, his involvement in hedging activities, his use of the Company's bankers, lawyers, and employees for his personal business dealings, his expansion of Chesapeake's exploration and drilling program to advance his personal interests, the numerous VPPs entered into by the Company and the resulting liabilities to the Company from these deals, and the risks and conflict of interests issues surrounding his actions.

### 2.    Board and Senior Executives

156.    The Board and senior executives likewise knew about the key aspects of the fraud.  The FWPP has existed, in some form, since 1993, and the Board has approved revisions to McClendon's employment agreement pursuant to which he participated in the FWPP.

157.    Additionally, the Board knew that the FWPP allows McClendon to engage in personal financial transactions by utilizing his well interests as collateral.  In fact, the FWPP agreement clearly states:

> This Founder Well Participation Program does not limit the sale, mortgage, gift or assignment by a Founder of an interest in a Program Well once the interest has been assigned of record by the Company Entities.

158.    Chesapeake's Compensation Committee's Charter requires that its members "[r]eview compliance with and make recommendations to the Board regarding the participation of the CEO in accordance with the Founder Well Participation Program."   As members of the Company's Compensation Committee, Defendants

Eisbrenner, Keating, Maxwell, Rowland, and Whittemore were tasked with ensuring that McClendon's use of the FWPP was appropriate.

159.    In addition, the 2009 and 2010 Proxy Statements reveal, in a section titled "All Other Compensation Table" that McClendon could use his well interests to secure financing.  Those Proxy Statements provide amounts that represent:

> Mr. McClendon's utilization certain of the Company's reservoir engineering staff to provide reserve data and analysis related to personal financing transactions entered into by Mr. McClendon with respect to certain of his interests in the Company's wells acquired under the Founder Well Participation Program.

Those amounts are $131,226 (as reported in the 2009 Proxy Statement for 2008) and $62,303 (as reported in the 2010 Proxy Statement for 2009).

160.    The Company made a similar disclosure in its 2011 Proxy Statement, although Chesapeake also noted that Mr. McClendon reimbursed the Company for the estimated $375,000 cost of using Chesapeake personnel for his personal financing transactions.

161.    Thus, the Compensation Committee in particular, and the full Board, knew that McClendon had engaged in "personal financing transactions" using "certain of his interests in the Company's wells," which transactions included the pledging of McClendon's well interests to obtain over a billion dollars in loans, and the use of those well interests in VPPs.  Defendants likewise knew or recklessly disregarded the fact that the FWPP does not actually align McClendon's interests with the interests of the Company and that the sales of McClendon's interests were not in conjunction with the Company's sales.

162.    The Company's senior executives also knew about McClendon's and the Company's VPPs.  As part of a VPP transaction, both the Company and McClendon pledged to deliver to banks set amounts of gas or oil (from their respective well interests) for a certain period of time in exchange for large amounts of capital.  The Senior Executive Defendants had to know about the VPPs, as the oil and gas was actually delivered to third parties.

163.    Further, Chesapeake's Audit Committee Charter states that the Audit Committee's job is to oversee "(a) the integrity of the Corporation's financial statements, (b) the Corporation's compliance with legal and regulatory requirements, (c) the independent auditor's qualifications and independence, and (d) the performance of the Corporation's internal auditor and independent auditor."  In order to accomplish these duties, the Audit Committee is required to maintain open lines of communication between the directors, auditors, and the financial management of the Company. Specifically, Audit Committee members are tasked, *inter alia*, to:

> Review and discuss with management and the independent auditor (a) significant financial reporting issues and judgments made in connection with the preparation of the Corporation's financial statements, including the effects of alternative GAAP methods on the financial statements, (b) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Corporation's selection or application of accounting principles, (c) material issues on which audit team consulted the independent auditor's national office; (d) accounting adjustments that were noted or proposed by the independent auditors but were "passed" (as immaterial or otherwise); and (d) any management or internal control letter issued, or proposed to be issued, by the independent auditor to the Corporation.

*       *       *

Discuss with management and the independent auditor any major issues as to the adequacy of the Corporation's internal controls, any special audit steps adopted in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting.

Review and discuss with management, the internal auditor and the independent auditor management's annual internal control report and the independent auditor's attestation of the report prior to the filing of the Corporation's Form 10-K.

Review and discuss with management and the independent auditor the annual audited financial statements, including the Corporation's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and recommend to the Board whether the audited financial statements should be included in the Corporation's Form 10-K.

Discuss with management and the independent auditor the effect of regulatory and accounting initiatives on the Corporation's financial statements.

164.    In short, as members of the Company's Audit Committee, Defendants Davidson, Hargis, and Miller had access to all of Chesapeake's financial information, and were aware of the Company's financial condition well in advance of any public filing. Therefore, Defendants Davidson, Hargis, and Miller knew or recklessly disregarded the fact that the disclosures made in Chesapeake's public filings were false and/or misleading.

165.    The Chesapeake Board was aware of McClendon's Heritage hedge fund and personal hedging activities, as the Board addressed these matters in their revisions to McClendon's employment agreements.  As explained above, McClendon's employment contract was revised in 2009 to ban McClendon from providing input or advice to any "passive investment entity" (such as a hedge fund) in which he invests.   Moreover, unlike the contracts for other Company executives, McClendon's contract permits him to

become a general partner or member of a partnership or corporation, and allows him to trade in options and futures on commodities such as oil and gas.   Thus, the Board specifically addressed McClendon's ability and right to engage in hedging activities, establishing a strong inference of scienter that the Board knew about McClendon's past hedging activities and his present, or right to presently engage, in hedging transactions.

166.   The Company's General Counsel, Henry J. Hood, has admitted that the Board knew about McClendon's personal dealings.  In Chesapeake's April 18, 2012 press release (attached to a Form 8-K filed with the SEC on April 18, 2012), Hood stated:

> The Board of Directors is fully aware of the existence of Mr. McClendon's financing transactions and the fact that these occur is disclosed in the proxy.  Additionally, the total amount of his cost obligations and revenue attributable to the FWPP for each year are detailed in the proxy.  The FWPP fully aligns the interests of Mr. McClendon with the company and the Board of Directors supports this program as does the majority of its shareholders.

167.   In an attempt to clarify Hood's statements, the Company released an April 26, 2012 press release (attached to a Form 8-K filed with the SEC on April 26, 2012).  In the press release, Hood explained:

> The statement that "the Board of Directors is fully aware of the existence of Mr. McClendon's financing transactions" was intended to convey the fact that the Board of Directors is generally aware the Mr. McClendon used interests acquired through his participation in the FWPP as security in personal financing transactions.  The Board of Directors did not review, approve or have knowledge of the specific transactions engaged in by Mr. McClendon or the terms of those transactions.

168.   This clarification failed to undermine the fact that the Board was at least generally aware of McClendon's personal financing dealings such as the use of his well interests to obtain personal loans, his hedging activities, and his own VPP transactions.

## IX.  ALLEGATIONS PERTAINING TO CONTROL PERSON LIABILITY

169.    The Senior Executive Defendants were controlling persons of Chesapeake within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions with the Company, the Senior Executive Defendants possessed the power and ultimate authority to control, and did control, the contents of Chesapeake's quarterly reports, annual reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Because of their positions with the Company, and their unrestricted access to material non-public information available to them but not to the public, the Senior Executive Defendants knew that the public statements by Chesapeake specified herein were materially false and misleading and had the ability and opportunity to prevent their issuance or cause them to be corrected.

170.    The Senior Executive Defendants held the top management positions within the Company and thereby controlled the Company individually and collectively. Specifically:

171.    McClendon served as both CEO and Chairman of the Board from 1989 until early May 2012, when the Board stripped McClendon of his Chairman position.

172.    Dell'Osso currently serves as Executive Vice President of Finance and Chief Financial Officer of Chesapeake.  Dell'Osso also serves as Chief Financial Officer and Executive Vice President of Finance of Chesapeake Midstream Development, L.P., a Chesapeake subsidiary.

173.    Johnson has served as Senior Vice President of Accounting, Controller, and Chief Accounting Officer of the Company since 2000.

174.    Rowland served as Chesapeake's Chief Financial Officer and Executive Vice President of Finance until October 29, 2010.

175.    The public filings of Chesapeake evidence the key roles played by the Senior Executive Defendants in the Company's operations, public statements and financial reporting.

176.    McClendon signed all of the Company's 10-Qs and 10-Ks filings during the Class Period.

177.    Dell'Osso signed Chesapeake's March 2011 10-K; February 2012 10-K; November 2010 10-Q; May 2011 10-Q; August 2011 10-Q; November 2011 10-Q; and May 2012 10-Q.

178.    Johnson signed Chesapeake's March 2010 10-K and February 2012 10-K.

179.    Rowland signed Chesapeake's; May 2009 10-Q; November 2009 10-Q; May 2010 10-Q; March 2010 10-K; July 2010 10-Q; August 2010 10-Q; and November 2010 10-Q.

180.    Both McClendon and Dell'Osso or Rowland certified that they had reviewed each 10-Q filed during the Class Period and that based on that review each 10-Q "does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which statements were made, not misleading to the period covered…"

181.    Furthermore pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, McClendon and Dell'Osso or Rowland certified each 10-Q filed during the Class Period "fully complies with the requirements of Section 13(a) or 15(d) of the Securities

Exchange Act of 1934; and that the information contained in the Reports [10-Qs] fairly presents, in all material respects, the financial condition and results of operations of the Company."

## X.    FRAUD ON THE MARKET

182.    At all relevant times, the market for Chesapeake was an open, efficient and well developed market for the following reasons, among others:

a)  Chesapeake's stock met the requirements for listing and was listed and actively traded on the NYSE under the symbol CHK, a highly efficient and automated market;

b)  As a public company, Chesapeake filed periodic public reports with the SEC;

c)   Chesapeake regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d)   Chesapeake was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales forces and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

183.    As a result of the foregoing, the market for Chesapeake common stock promptly digested current information regarding Chesapeake from all publicly-available sources and reflected such information in Chesapeake's common stock price.   Under these circumstances, all purchasers of Chesapeake's common stock during the Class

Period suffered similar injury through their purchase of Chesapeake's securities at artificially inflated prices and a presumption of reliance applies.

## XI.    NO SAFE HARBOR

184.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. In addition, to the extent any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and Defendants failed to update those statements which later became inaccurate.

## XII.    LOSS CAUSATION

185.    Defendants' wrongful conduct, as alleged herein, was the direct and proximate cause of the economic injury suffered by Plaintiff.  Throughout the Class

Period, the market price of Chesapeake common stock was inflated by the false and misleading statements made by Defendants.  As a result, Plaintiff purchased Chesapeake common stock at artificially inflated prices during the Class Period.  Beginning on April 18, 2012, a series of partial corrective disclosures were made to the market on a piecemeal basis revealing various aspects of the fraud.  As the partial corrective disclosures were made, the price of Chesapeake common stock declined in response, as the artificial inflation caused by Defendants' material omissions and false and misleading statements was removed from the price of Chesapeake common stock, thereby causing substantial damage to Plaintiff.

186.   On April 18, 2012, on the first of the series of corrective disclosures, the Company's stock dropped from its $19.12 close on April 17, 2012 to close at $18.06 on April 18, a $1.06 (or 5.5%) drop, following the disclosure that McClendon had borrowed over a billion dollars on his Chesapeake well interests, and that the bulk of this financing came from an entity (EIG) that was also providing financing to the Company.

187.   On May 2, 2012, Chesapeake's stock closed at $16.74 following disclosures that McClendon had for years operated a hedge fund trading in the same commodities produced by Chesapeake, and the news that the Company was stripping him of his position as Chairman.  Following additional disclosures on May 10 and May 11 that the Company had $1.4 billion in previously undisclosed off-balance-sheet liabilities and was in danger of violating its loan covenants, the Company's stock dropped further to close on May 11, 2012 at $14.81.

188.    All these stock drops directly relate to the revelations of aspects of the fraud alleged herein, including the fact that McClendon was expanding the Company's exploration and drilling activities in order to increase the amount of Company assets being transferred to him, even though that expansion overloaded the Company with debt and was not in its best interests.

189.    It was entirely foreseeable to Defendants that concealing (1) the costs and risks associated with Chesapeake's VPPs; (2) the extent of the Company's indebtedness; (3) the risks associated with McClendon's private financing activities; (4) McClendon's private hedging activities; and (5) the fact that the FWPP did not align McClendon's interests with the Company's would artificially inflate the price of Chesapeake's common stock.  It was similarly foreseeable to Defendants that the revelation of these facts and the true financial condition of the Company would cause the Chesapeake's stock price to plummet as the inflation caused by the materially misleading statements was corrected. As a result, the conduct of Defendants proximately caused foreseeable damages to Plaintiff.

190.    Thus, the stock price declines detailed above were directly related to disclosure of the previously issued materially false and misleading statements and omissions, and establish the loss causation element of Plaintiff's claims.

## XIII.   CLASS ACTION ALLEGATIONS

191.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Chesapeake's common stock during the Class Period, April 30, 2009 to May 10, 2012 and were

damaged thereby (the "Class").   Excluded from the Class are (i) Defendants; (ii) members of the immediate family of each Individual Defendant; (iii) any person who was an officer or director of Chesapeake; (iv) any firm, trust, corporation, officer, or other entity in which any Defendant has or had a controlling interest; (v) any person who participated in the wrongdoing alleged herein; and (vi) the legal representatives, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any such excluded party.

192.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Throughout the Class Period, Chesapeake's common stock was actively traded on the NYSE, an efficient market. As of May 7, 2009, Chesapeake had 626,171,207 shares of common stock outstanding, and as of May 30, 2012, there were 662,343,738 shares of common stock outstanding.   While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds of thousands of members in the Class.

193.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class predominate over questions that may affect individual Class members, including:

a)  Whether Defendants violated the federal securities laws;

b)  Whether Defendants misrepresented material facts concerning Chesapeake;

c)  Whether Defendants' statements omitted material facts necessary to make the statements not misleading in light of the circumstances under which they were made;

d)  Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e)  Whether Defendants engaged in perpetrating a manipulative and deceptive device and/or scheme and/or otherwise engaged in a fraudulent course of conduct;

f)Whether the Chesapeake's SEC filings issued during the Class Period which contained financial information (*i.e.*, its Forms 10-K, 10-Q, and 8-K) contained untrue or materially misleading statements;

g) Whether the prices of Chesapeake's common stock were artificially inflated; and

h) The extent of damage sustained by Class members and the appropriate measure of damages.

194.    Plaintiff's claims are typical of those of the Class.

195.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

196.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT ONE**
**FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE**
**10B-5**
**AGAINST ALL DEFENDANTS**

197.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

198.   During the Class Period, Chesapeake and each of the Individual Defendants disseminated or approved the false statements specified herein, which they knew or recklessly disregarded were false and misleading and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

199.   The Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Chesapeake common stock during the Class Period. As detailed herein, the misrepresentations contained in, or the material facts omitted from, these Defendants' public statements, including SEC filings, concerned, among other things, the facts underlying the claims in this Complaint.

200.   Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and

participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiff and the Class; made various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements with a severely reckless disregard for the truth; and employed devices, and artifices to defraud in connection with the purchase and sale of securities, which were intended to, and did:  (i) deceive the investing public, including Plaintiff and the Class, regarding, among other things, the facts underlying the claims in this Complaint; (ii) artificially inflate and maintain the market price of Chesapeake securities; and (iii) cause Plaintiff and other members of the Class to purchase Chesapeake securities at artificially inflated prices.

201.   The allegations set forth above establish a strong inference that the Defendants acted with scienter throughout the Class Period in that they had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts.  Defendants' material misrepresentations and/or omissions were done knowingly or with extreme recklessness for the purpose of deceiving the investing public and supporting the artificially inflated price of Chesapeake's stock.

202.   As a result of the Defendants' dissemination of materially false and misleading information and failure to disclose material facts, Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, Plaintiff and the Class paid artificially inflated prices for Chesapeake securities.  Plaintiff and the Class would

not have purchased Chesapeake securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.  At the time of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth herein, Plaintiff and the Class were ignorant of the falsity of the statements and were ignorant of the material omissions.

203.    Defendants' wrongful conduct was the direct and proximate result of Plaintiff's and the Class' injuries in connection with their purchases of Chesapeake stock during the Class Period.  As a result, Defendants are liable for all materially false and misleading statements made during the Class Period, as alleged above.

**COUNT TWO**
**FOR VIOLATION OF §20(A) OF THE EXCHANGE ACT**
**AGAINST THE SENIOR EXECUTIVE DEFENDANTS**

204.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

205.    During the Class Period, the Senior Executive Defendants, by virtue of their senior executive positions in Chesapeake, were privy to confidential information concerning Chesapeake, its operations, finances, financial condition and present and future business prospects.  The Senior Executive Defendants also had access to materially adverse non-public information concerning McClendon's control and transactions with Chesapeake.  Because of their positions within Chesapeake, the Senior Executive Defendants had access to non-public information about its business, finances, conversations and connections with other corporate officers and employees, attendance at

management and/or board meetings and committees thereof and via reports and other information provided to him in connection therewith.  Because of their possession of such information, the Senior Executive Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were concealed from the investing public.

206.    The Senior Executive Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its SEC filings, press releases and presentations to securities analysts and through them, to the investing public.    The Senior Executive Defendants were provided copies of the Company's reports, press releases, advertisements and SEC filings alleged as materially misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.    Thus, the Senior Executive Defendants had the opportunity to commit the fraudulent acts alleged herein.

207.    As senior executives and controlling persons of the publicly traded company whose common stock was registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NYSE and governed by the federal securities laws, the Senior Executive Defendants had a duty to promptly disseminate accurate and truthful information with respect to Chesapeake's dealings with McClendon.    The Senior Executive Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

208.    As alleged in detail above, Chesapeake and the Individual Defendants each committed a primary violation of federal securities laws, Section 10(b) and Rule 10b-5,

through their knowing or reckless dissemination of materially false and misleading statements and omissions throughout the Class Period. By virtue of their positions as controlling persons, the Senior Executive Defendants are liable under Section 20(a) of the Exchange Act.

209. As a direct and proximate result of the conduct of the Senior Executive Defendants, Plaintiff and the Class have suffered damages in connection with their purchase or acquisition of Chesapeake securities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the class representative and Plaintiff's counsel as class counsel;

B. Awarding compensatory damages in favor of Plaintiff and other class members against all Defendants, jointly and severally, for all the damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, plus interest;

C. Awarding Plaintiff and the class their reasonable costs and expenses, including attorneys' and experts' fees; and

D. Awarding such other and further relief as the court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.

Dated: June 5, 2012

s/     John W. Norman
John W. Norman, OBA #6699
Emmanuel E. Edem, OBA #2614
L. Mark Bonner, OBA #14541
NORMAN & EDEM, PLLC
Renaissance Centre East
127 Northwest 10th Street
Oklahoma, OK 73103-4927
Tel: (405) 272-0200
Fax: (405) 235-2949
Email: jwn@nemw.com

-and-

Jay W. Eisenhofer *
John C. Kairis*
Oderah C. Nwaeze*
GRANT & EISENHOFER, P.A.
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
Email: jkairis@gelaw.com

Attorneys for Plaintiff
Operating Engineers Construction
Industry And Miscellaneous Pension
Fund

---

* Mssrs. Eisenhofer, Kairis and Nwaeze are members in good standing with the Delaware State Bar (among others) and will be seeking admission into this Court pursuant to LCv83.2(g) and LCvR83.3 once this case is commenced.